

**FILED**

FEB 1 3 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **CHARLES T. TANNER,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| v. | |
| | |
| **CITY OF CHICAGO, a municipal corporation, and CHICAGO POLICE OFFICERS NATALINA BIEROD, JUSTIN LAWLER, KRYSTYNA PIKUL,** | |
| | ) |
| | ) |
| | ) |
| | ) |
| **DEFENDANTS.** | ) |

1:20-cv-01082
Judge Joan H. Lefkow
Magistrate Judge Maria Valdez

## COMPLAINT

Plaintiff Charles T. Tanner for his Verified Complaint against Defendants City of Chicago, and the Chicago Police Officers Natalina Bierod, Justin Lawler, and Krystyna Pikul, alleges as follows:

### NATURE OF THE ACTION

1. This is an action bringing race discrimination claim against Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Civil Rights Act of 1871, 42 U.S.C. § 1981 ("Section 1981"), the Illinois Human Rights Act, 775 ILCS 5/2, *et seq*. ("IHRA"), and under the common law for defamation, breach of contract, and tortious interference with a business expectancy.

2. Plaintiff Charles T. Tanner ("Mr. Tanner") is a former probationary police officer of Defendant City of Chicago's Department of Police.

1

## THE PARTIES

3.      Mr. Tanner is a citizen of the State of Illinois, residing in Cook County.

4.      The City of Chicago is a municipal corporation and is a citizen of Cook County, Illinois.

5.      Natalina Bierod is a citizen of the State of Illinois, residing in Cook County, and an employee of the Chicago Police Department, Star No. 14634.

6.      Justin Lawler is a citizen of the State of Illinois, residing in Cook County, and an employee of the Chicago Police Department, Star No. 7004.

7.      Krystyna Pikul is a citizen of the State of Illinois, residing in Cook County, and an employee of the Chicago Police Department, Star No. 7065.

8.      Bierod, Lawler, and Pikul, are referred to collectively as the "Officer Defendants."

## JURISDICTION AND VENUE

9.      Jurisdiction is invoked under 28 U.S.C. § 1331 because this case involves federal questions arising under Title VII and Section 19811983.

10.     Venue is appropriate in the Northern District of Illinois because Defendants are citizens of the Northern District. Additionally, Mr. Tanner's employment was located in this judicial district. Therefore, venue is invoked pursuant to 28 U.S.C. §§ 1391(b)(1)-(2).

11.     Supplemental jurisdiction over the Illinois common law and statutory claims is invoked pursuant to 28 U.S.C. § 1367.

## STATEMENT OF FACTS

12.     Mr. Tanner is a U.S. citizen and a white man of European descent.

13.     Mr. Tanner received his associate's degree in criminal justice from Harper Community College on March 1, 2015, and has made his career in law enforcement.

2

14. Mr. Tanner had been a correctional officer with the Cook County Sheriff's Office ("CCSO") since June 2, 2014.

15. On September 5, 2017, he requested a leave of absence to begin employment as a police officer with the City of Chicago's Department of Police ("Chicago Police Department" or "CPD").

16. From September 18, 2017 to July 11, 2018, CPD employed Mr. Tanner as a probationary police officer, employee number 121602, assigned to Unit 044 – Recruit Training Section.

17. As a probationary police officer, certain CPD regulations, including but not limited to the CPD Field Training and Evaluation Manual and Special Order S11-02, governed his employment.

18. Mr. Tanner excelled while completing all of the required training to become a police officer with the CPD, including self-defense/control tactics, firearms, physical skills, first aid and police driving.

19. Mr. Tanner passed the final state exam and became a state-certified police officer.

20. During six months of training at the Chicago Police Training Academy (the "Academy"), Mr. Tanner observed several members of the class struggling to perform the necessary duties of a police officer, including three female probationers who were not of American national origin. Those probationers who struggled were Krystyna Pikul, who was from Poland, Natalina Bierod, Guadalupe Reyes, and a fourth, a white man, Justin Lawler. The ethnicities of these three individuals had no bearing on Mr. Tanner's opinions of their performance as others who were of the same ethnicity in the class performed well.

21. Despite having regular contact with him for six months, not a single member of his Academy class of 111 ever made a complaint against him.

22. Then, at the very end of the Academy, two anonymous complaints were made about the program.

23. In response, the Academy required every member (all 111) of his class to answer questions about whether they had been subjected to or witnessed sexual conduct, harassment, mistreatment, disrespect, bullying, *etc*. Mr. Tanner and 106 others in his class responded in the negative to each of the questions, meaning they had neither experienced, nor witnessed anyone experiencing, the various kinds of harassment and intimidation listed in the questionnaire.

24. Apparently, the only four (out of 111) to answer in the affirmative were four individuals who spent a great deal of time together during class and who socialized together outside work.

25. Specifically, Ms. Pikul, Ms. Bierod, Mr. Lawler, and Ms. Reyes—the same four who had been struggling with training—all claimed to have had problems with a handful of their classmates, including Mr. Tanner.

26. Though Sergeant John P. Spellman, investigator from the BIA, was assigned to review the allegations and, to interview witnesses and write a report, it appears that none of the evidence was reviewed in accordance with the normal standards applied to such investigations.

27. Ms. Bierod, who was the assistant class commander, claimed that Mr. Tanner mocked her and stated, "If we had an assistant class commander" we could do this or words similar to that effect up to 10 times and repeatedly called her a "snitch." Those allegations were not sustained.

28. Mr. Lawler claimed that Mr. Tanner had called him a snitch or words similar to that effect up to 50 times, and that Mr. Tanner had engaged in other misconduct. These allegations were not sustained.

29. Ms. Pikul claimed that Mr. Tanner had used the word "stupid" or words similar to that effect "100" times based on her "national origin or ancestry," used the word "loser" approximately "50" times, mocked Ms. Pikul's accent by saying "I'm never a loser" up to "200" times, "I ride desk" "500" times, and "I do not understand" "500" times, and "gypsy." These numbers are incredible and not corroborated by any witnesses. Despite the extremely high number of times these statements were purportedly made, there is no explanation in the report explaining why no other person in the class other than the four Officer Defendants heard the statements being made.

30. If any Academy staff person had seen even one instance (not to mention the claimed thousand-plus instances) of this conduct they certainly would have taken action to direct Mr. Tanner never to use such language and documented such conduct. No such action was taken.

31. During the investigation, Mr. Tanner advised Sergeant Larry Snelling of the abundance of cheating going on in the Academy during a one-on-one conversation.

32. During the "investigation" Mr. Tanner not only responded to the allegations in writing but was also interviewed and then deposed.

33. During his interview and the deposition Mr. Tanner also responded that the allegations were false, and Mr. Tanner advised Sergeant Spellman of the cheating in the Academy. That was brushed off and not addressed.

34.     Others who were similarly falsely accused also denied the allegations in writing and in their interviews and depositions. The others, however, were believed and no action was taken against them. Mr. Tanner, on the other hand, was terminated.

35.     In a summary report, entitled Summary Report CL 1088773, prepared by Sergeant Spellman (but never given to Mr. Tanner by the CPD) (hereinafter referred to as "Summary Report"), Sergeant Spellman found the Officer Defendants lacked credibility as to the allegations against all of Mr. Tanner's colleagues, but as to Mr. Tanner found the otherwise incredulous allegations to be credible. In other words, Sergeant Spellman found the four Police Officer Defendants to have fabricated claims together against three individuals (making them liars), but as to the fourth person (Mr. Tanner) they were perfectly credible.

36.     There was no legitimate reason for Sergeant Spellman to reject the allegations made against the three others, and then accept the wild allegations against Mr. Tanner.

37.     There is no mention in the Summary Report that there were accusations made regarding two African-American probationary officers, Raphael O'Bryant and Demaine Rhodes, that mirrored the accusations against Mr. Tanner, Robert Garren and Michael Mendez, but Deputy Chief Calloway told O'Bryant and Rhodes that they would be "taken care of" and, true to his word, they were never so much as identified in the report, investigated or disciplined.

38.     Mendez and Garren were given a more lenient punishment, but even that pales in comparison to the treatment of the accused who were African American. Accusations about Garren and Mendez at least were acknowledged, *i.e.* they were referred to in the investigation as individuals accused of the same misconduct Mr. Tanner was and they were interviewed like Mr. Tanner was.

39. O'Bryant and Rhodes—who were accused of conduct similar to that alleged against Tanner, Mendez, and Garren—did not so much as make it onto the list of those who were accused. The level of consideration of the same accusations against individual officers in this case was clearly based on race: accusations against African-American officers were "taken care of," but those against Caucasian and Hispanic officers were pursued. This was in addition to the disparate treatment Mr. Tanner received later when, after the investigation, Garren and Mendez were given 5 and 15-day suspensions while Mr. Tanner, the white, male scapegoat who had blown the whistle on Academy cheating, was terminated.

40. The two colleagues who were believed over the accusers included Mendez, who is not a Caucasian male as Mr. Tanner is, and Garren. Though Garren is a Caucasian male, the CPD only needed one head to roll to put on a show of making it look like it was responding to the anonymous complaints. Eliminating everyone but Caucasian males, the CPD chose Mr. Tanner, the whistleblower who had brought up the cheating in the Academy, as the sole person to be terminated.

41. Sergeant Spellman knew or should have known that the information provided to him by the four complainants was not contemplated in good faith, yet he still provided that Summary Report to his superiors.

42. On July 11, 2018, then-Superintendent of Police, Eddie T. Johnson, discharged Mr. Tanner from the Department of Police and the City of Chicago effective that day.

43. Though the CPD gave the reason of Rule 9, Section 2, which states "a department head may discharge an employee during the probationary period and should notify the Commissioner of Human Resources in writing . . ." for the termination when advising him that his employment was ending, internal documents stated "[BIA] conducted an investigation in regards

7

to workplace harassment and determined [Mr. Tanner] violated Department rules 2, 6, and 8, and also violated the Department's Equal Employment Policy, E-01-01."

44.     When specifically asked for the reasons by the Illinois Department of Employment Security ("IDES") CPD claimed it as misconduct or termination for cause.

45.     After a hearing before the IDES adjudicator, which included testimony under oath, the IDES rejected the CPD's claim about Mr. Tanner's alleged misconduct, the IDES adjudicator found the inconsistent positions of the CPS, first stating Mr. Tanner was terminated for no reason, and then claiming he was terminated for misconduct, made the CPS incredible. The IDES adjudicator awarded Mr. Tanner unemployment benefits stating that he did not commit any type of misconduct, and all the evidence against him was hearsay and this finding was upheld on appeal to the IDES Board of Review.

46.     On July 13, 2018, Mr. Tanner sought reinstatement at CCSO as was customary for correctional officers who had taken leaves of absence.

47.     However, CCSO refused to let him return to work. Mr. Tanner's union filed a grievance.

48.     In the Winter of 2018, Mr. Tanner filed a complaint with the Illinois Training and Standards Board about the cheating at the Academy. He supplied documents of "study guides" provided by the Academy to help probationary police officers pass required state tests. In other words, the probationary police officers were being supplied with the answers to the exams in advance of the exams.

49.     An investigation into the CPD resulted from Mr. Tanner's complaint to the Illinois Training and Standards Board and Mr. Tanner cooperated with the investigator's requests.

50. On February 11, 2019, Mr. Tanner, through counsel, sent a letter to CPD highlighting discrepancies and flaws in the investigation.

51. Despite being alerted to problematic methodology and results, the CPD did not reopen the investigation. CPD did not respond to a follow up letter.

52. At some point prior to March 19, 2019, CPD provided to CCSO documents in response to a subpoena related to the investigation that led to Mr. Tanner's termination, including the Summary Report.

53. CPD did not provide a copy of Mr. Tanner's February 11, 2019 letter challenging the results and methodology of the investigation to CCSO, nor did it provide all exculpatory material, as was its usual practice.

54. CPD's willful omission of potentially exculpatory material and the February 11, 2019 letter constitutes willful and wanton conduct, and a violation of its usual procedure.

55. CPD's provision of material it knew to be unreliable ultimately led to Mr. Tanner's termination from the CCSO, a decision upheld by an arbitrator after a grievance hearing.

56. Teamsters Local 700 has appealed the arbitrator's decision to the Circuit Court of Cook County, case no. 2019 CH 12011.

57. On April 5, 2019, Mr. Tanner dually filed a charge of discrimination with the EEOC and the IDHR alleging race discrimination.

58. On November 15, 2019, Mr. Tanner received his Dismissal and Notice of Right to Sue from the Department of Justice, closing EEOC Charge No. 440-2019-03855.

59. On January 22, 2020, Mr. Tanner received his Notice of Dismissal and Order of Closure from the Illinois Department of Human Rights, closing charge No. 2019 CR 3049.

60. Mr. Tanner has exhausted his administrative remedies under Title VII and the IHRA.

## Count I: Breach of Contract
### (Against Defendant City of Chicago)

61. Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

62. As a probationary police officer with the City of Chicago, Mr. Tanner's employment was governed by the probationary police officer policy manual.

63. CPD regulations require that all investigations be conducted fairly, and that the City not discriminate on the basis of race.

64. The probationary police officer manual created an employment contract.

65. Defendant City of Chicago did not conduct the Investigation impartially and discriminated against Mr. Tanner on the basis of his race (white).

66. Mr. Tanner performed his end of the contract by passing his exams and becoming a state-certified officer.

67. The City of Chicago refused to award Mr. Tanner his star in violation of the contract.

68. The City of Chicago's conduct has damaged Mr. Tanner. Those damages include but are not limited to lost wages, pain and humiliation, permanent damage to his professional reputation and career, and denial of benefits and employment security.

**WHEREFORE**, Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against Defendant City of Chicago as follows:

A. An award of compensatory damages in an amount to be proven at trial;

B. An award of punitive damages to be determined by the trier of fact;

C. An award of costs; and

D.      Such other, further, and additional relief as may be just in law and in equity.

## Count II: Tortious Interference with Business Expectancy
### (Against Defendant City of Chicago)

69.      Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

70.      Mr. Tanner was an employee of the Cook County Sheriff's Office (the "Sheriff's Office" or "CCSO"). All parties were aware of said employment relationship.

71.      Defendants had no justification for providing false information to the Sheriff's Office.

72.      Prior to his termination on July 11, 2018, Mr. Tanner reasonably expected to continue his employment with the Sheriff's Office.

73.      The City of Chicago knew or should have known that the Officer Defendants' information that was included in the Summary Report was not contemplated in good faith.

74.      City of Chicago acted with malice by intentionally creating documentation it knew was false and by refusing to provide the appropriate documentation to the CCSO concerning Mr. Tanner's employment, specifically a Letter of Good Standing.

75.      City of Chicago intentionally and unjustifiably interfered with Mr. Tanner's employment by submitting false information to and unreasonably withholding truthful information they knew or should have known was false and incomplete to CCSO on or about March 19, 2019 and by refusing to provide the CCSO with the Letter of Good Standing though providing a Letter of Good Standing was the normal procedure for the City of Chicago for employees who were not terminated for conduct violations.

76.      Defendant's provision of those false and incomplete statements was not contemplated in good faith. Rather, these actions were taken with ill will and malice.

11

77. The City of Chicago's intentional and unjustifiable provision of false and incomplete information to CCSO caused CCSO to breach from the Sheriff's Office knowing that its conduct would result in Mr. Tanner losing his employment with the Sheriff's Office.

78. As a result of tortious interference by the City of Chicago and the resultant breach by CCSO of its contract with Mr. Tanner, Mr. Tanner has damages including, but not limited to, substantial loss of economic opportunity and damage to his professional reputation.

**WHEREFORE**, Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against the Officer Defendants as follows:

A. An award of compensatory damages in an amount to be proven at trial;

B. An award of costs; and

D. Such other, further, and additional relief as may be just in law and in equity.

**Count III: Violation of Section 1981**
**(Discrimination Based on Race)**
**(Against Defendant City of Chicago)**

79. Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

80. Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

81. As amended by the Civil Rights Act of 1991, Section 1981(b) provides:

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contacts, and the enjoyment of all benefits, privileges, terms, and condition of the contractual relationship.

82. Mr. Tanner is a white man making him a member of a protected class.

12

83.     Mr. Tanner was qualified for his position, as demonstrated by his acceptance into the Academy and his successful completion of the training and passing his certification.

84.     The Parties' contractual relationship was established by CPD's probationary police officer policy manual and CPD regulations.

85.     At all material times, Mr. Tanner met Defendant's legitimate expectations by adequately performing all of his job duties.

86.     Defendant knew the terms of the contract and Defendant's obligations under them.

87.     Defendant breached that contract by imposing performance requirements and punishments on him that were not imposed on similarly situated Counterparts outside of his protected class (white) for the same conduct.

88.     Defendant summarily terminated his employment without cause.

89.     Defendant's shifting reasons for Mr. Tanner's termination allow a reasonable fact finder to infer pretext.

90.     Defendant's pretexts were necessary to hide that his termination was based on illegal reasons, including, but not limited to, discrimination based on race.

91.     Defendants engaged in intentional discrimination and acted with malice or reckless indifference to Mr. Tanner's federally protected rights under Section 1981.

92.     Such discrimination hampered Mr. Tanner's ability to enforce his employment contract, bringing his claims within Section 1981's scope of protection.

93.     As a result of Defendant's discrimination in violation of Section 1981, Mr. Tanner suffered damages including without limitation physical injury, pain and suffering, damage to his reputation, lost wages, adverse effects on his future career, seniority, earnings, benefits, and attorney's fees and costs.

**WHEREFORE,** Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against Defendant as follows:

A. An award of damages for back pay, front pay, accrued vacation pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. An award of prejudgment interest;

E. An award to Plaintiff for reasonable attorneys' fees and costs; and

F. All other relief this Court deems just.

**Count IV: Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e**
**(Discrimination Based on Race)**
**(Against Defendant City of Chicago)**

94. Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

95. Title VII of the Civil Rights Act provides that "[i]t shall be an unlawful employment practice for an employer…to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

96. Defendant City of Chicago is an employer as defined by Title VII because it has more than 15 employees in an industry affecting interstate commerce.

97. Mr. Tanner's race is white, making him a member of a protected class.

98. At all material times, Mr. Tanner met Defendant's legitimate expectations by adequately performing all of his job duties.

99. Defendant discriminated against Mr. Tanner by imposing performance requirements and punishments on him but not on similarly situated, nonwhite employees.

14

100. Defendant discriminated against Mr. Tanner by terminating his employment for conduct that was tolerated in nonwhite, similarly situated employees.

101. Defendant treated similarly situated officers who were outside Mr. Tanner's protected class, white, more favorably as they were not terminated and, in some instances, not even investigated or disciplined.

102. Defendant's conduct described herein was done with malice or reckless disregard for Mr. Tanner's rights under Title VII.

103. As a direct and proximate result of Defendants' discriminatory conduct, Mr. Tanner has suffered damages, including but not limited to lost wages, lost benefits, loss of future employment commensurate with his experience and professional standing, loss of status and self-esteem, incidental damages, great expense, and pain and suffering in the form of emotional distress, embarrassment, and humiliation.

**WHEREFORE,** Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against Defendant as follows:

A. An award of damages for back pay, front pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. An award of prejudgment interest;

E. An award to Plaintiff for reasonable attorneys' fees and costs; and

F. All other relief this Court deems just.

### Count V: Tortious Interference with Business Expectancy
### (Against Officer Defendants)

104. Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

105.     Mr. Tanner was an employee of the Chicago Police Department. All parties were aware of said employment relationship.

106.     Defendants had no justification for providing false information critical of Mr. Tanner to the Bureau of Internal Affairs. which led CPD to breach its contract with Mr. Tanner.

107.     Prior to his termination on July 11, 2018, Mr. Tanner reasonably expected to continue his employment with CPD.

108.     The Officer Defendants interfered with Mr. Tanner's employment by submitting false complaints to their superiors.

109.     Defendants interfered with Mr. Tanner's employment to further their own interests, including protecting their personal reputations when they were struggling with police academy training and/or to prevent CPD leadership from faulting sergeants for a failure of leadership in managing the Academy class. The Officer Defendants did not act in the interest of the CPD in that their conduct resulted in the termination of the employment of Mr. Tanner, who was an experienced law enforcement professional who had performed well at the Academy and who was dedicated to his profession.

110.     As a result of tortious interference by the Officer Defendants, Mr. Tanner has damages including, but not limited to, substantial loss of economic opportunity and damage to his professional reputation.

**WHEREFORE**, Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against the Officer Defendants as follows:

A.     An award of compensatory damages in an amount to be proven at trial;

B.     An award of punitive damages to be determined by the trier of fact;

C.     An award of costs; and

D.      Such other, further, and additional relief as may be just in law and in equity.

### Count VI: Discrimination on the Basis of Race
### in Violation of the Illinois Human Rights Act
### (Against Defendant City of Chicago)

111.      Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

112.      Defendant City of Chicago is an employer as defined by the Illinois Human Rights Act, 775 ILCS § 5/1-101, *et seq.*, which prohibits discrimination in employment on the basis of race.

113.      Mr. Tanner is white, making him a member of a protected class.

114.      At all material times, Mr. Tanner met City of Chicago's legitimate expectations by adequately performing all of his job duties.

115.      City of Chicago discriminated against Mr. Tanner by terminating only his employment for purported misconduct, when similarly situated non-white probationary police officers were also accused of misconduct and not terminated.

116.      On information and belief, Defendant sought to fill Mr. Tanner's position with an employee outside his protected class.

117.      City of Chicago's conduct described herein was done with malice or reckless disregard for Mr. Tanner's rights under the IHRA.

118.      As a direct and proximate result of City of Chicago's conduct, Mr. Tanner has suffered damages, including but not limited to lost wages, lost benefits, loss of future employment commensurate with his experience and professional standing, loss of status and self-esteem, incidental damages, great expense, and pain and suffering in the form of emotional distress, embarrassment, and humiliation.

119.      On April 5, 2019, Mr. Tanner dually filed a charge of discrimination with the IDHR and EEOC.

17

120. The EEOC, through the Department of Justice, and the IDHR issued to Mr. Tanner their Dismissals and Notices of Right to Sue.

121. Plaintiff has exhausted his administrative remedies by obtaining a final order.

**WHEREFORE** Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against Defendant as follows:

A. An award of damages for back pay, front pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. An award of prejudgment interest;

E. An award to Plaintiff for reasonable attorneys' fees and costs; and

F. All other relief this Court deems just.

### Count VII: Defamation - Per Quod and Per Se
### (Against Officer Defendants)

122. Mr. Tanner incorporates paragraphs 1 through 60 as if restated herein.

123. Defendants Bierod, Lawlel and Pikul acted with actual malice in making false statements about Mr. Tanner to Sergeant Spellman and others at CPD.

124. Defendants knew their statements were false when made and that such statements would be damaging to Mr. Tanner professionally and personally.

125. Those statements were publicized within CPD in many ways, including but not limited to being repeated in the Summary Report of Sergeant Spellman's investigation.

126. These false statements impeached Mr. Tanner's reputation, lowered him in the estimation of CPD, and deterred the CPD from associating with him.

127. These false statements would be offensive to a reasonable person and were offensive to Mr. Tanner.

18

128. Defendants Bierod, Lawler, and Pikul had no justification for providing false information to Sergeant Spellman and others at CPD.

129. Prior to the publication of Defendants' false statements, Mr. Tanner reasonably expected to continue his employment with CPD.

130. Defendants' false statements led CPD to terminate Mr. Tanner's employment, damaging Mr. Tanner irreparably.

131. Defendants' false statements were not privileged.

132. As a result of defamatory statements by the Officer Defendants, Mr. Tanner has damages including, but not limited to, substantial loss of economic opportunity and damage to his professional reputation.

**WHEREFORE**, Plaintiff Charles T. Tanner respectfully requests the entry of judgment in his favor and against the Officer Defendants as follows:

A. An award of compensatory damages in an amount to be proven at trial;

B. An award of punitive damages to be determined by the trier of fact;

C. An award of costs; and

D. Such other, further, and additional relief as may be just in law and in equity

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury on all issues so triable.

19

Respectfully submitted,

**Dated**: February 13, 2020                    **CHARLES TANNER**

Drafted by:
Ruth I. Major (ARDC No. 6205049)
Laura Lefkow (ARDC No. 6318160)
The Law Offices of Ruth I. Major, P.C.
70 W. Madison St., Suite 2020
Chicago, Illinois 60602
Phone: (312) 893-7544
rmajor@major-law.com
llefkow@major-law.com

20